FILED
COURT OF APPEALS
DIVISION II

2013 APR -9 AM 9: 02

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br>                    Respondent,<br><br>    v.<br><br>LAWRENCE PATRICK RUIZ,<br>                    Appellant. | No. 42349-9-II<br><br><br>UNPUBLISHED OPINION |

VAN DEREN, J. — Lawrence Patrick Ruiz appeals his convictions on one count of first degree theft, one count of first degree possession of stolen property, and one count of first degree trafficking in stolen property. He argues that his trial counsel was ineffective for failing to (1) hire a forensic accountant to determine the value of the property allegedly stolen, (2) object to irrelevant testimony regarding his use of his employer's credit card to purchase gasoline, and (3) propose an adequate limiting instruction when one of the State's witnesses testified that defense counsel lied. He also argues, and the State concedes, that the trial court made a scrivener's error when it failed to indicate on the judgment and sentence that first degree theft and first degree possession of stolen property were same criminal conduct. Because Ruiz has failed to show that his counsel's allegedly deficient performance prejudiced him, we deny his ineffective assistance of

counsel claims and affirm his conviction, but we remand to the trial court to correct the judgment and sentence.

## FACTS

Ruiz was a field service technician for Life Fitness from April 1998 to December 2007. Life Fitness manufactures fitness equipment, including stationary bicycles, treadmills, cross trainers, and strength training equipment that it sells to gyms, hotels, sports teams, and the military. As part of his duties as a field service technician, Ruiz repaired and serviced Life Fitness equipment sold in the cities of Tacoma, Washington and Portland, Oregon, and areas in between.

Life Fitness's customer service center in Chicago received calls from Life Fitness customers when they experienced problems with their equipment. The customer service representative then diagnosed the problem and assigned the repair job to a field service technician. Life Fitness provided each technician with a service van equipped with repair parts. If a technician did not have the necessary parts in his or her service van to perform a repair, he or she called the Life Fitness dispatcher in Chicago to order the parts.

If Life Fitness's technicians had more parts than needed to complete a job, the technician could either retain the parts in his or her service van or could send them back to Life Fitness. If the technician kept the parts, the technician had to notify Life Fitness so that Life Fitness could keep track of all parts sent to its technicians. If a technician kept more parts than could be stored in his or her service van, the technician could rent a storage unit in Life Fitness's name, but only with Life Fitness's authorization. Life Fitness did not authorize a storage unit for Ruiz. If a technician encountered defective parts, Life Fitness required the technician to return the parts to Life Fitness in Chicago so the parts could be repaired and reused.

Life Fitness periodically inventoried its technicians' vans. When an inventory was ordered, the technician had to list each part in the service van and send that information to the Chicago office. Life Fitness then compared the technician's report with its record of what that particular service van should contain. A difference between the monetary value of the parts that Life Fitness's records showed for a particular van and the value shown in an inventory was called a "variance." Report of Proceedings (RP) at 122. The acceptable maximum variance was $10,000.

Technicians were not permitted to sell Life Fitness equipment. Thus, although Life Fitness technicians regularly carried parts in their service van, there was no reason for a technician to have an entire piece of Life Fitness equipment in their possession unless it belonged to the technician as their personal equipment. Life Fitness also prohibited its technicians from "[p]articipating in a business transaction to [the technician's] personal advantage based on information or relationships developed in [the technician's] job." RP at 98 (internal quotation marks omitted).

In 2007, Ruiz's former wife, Mary Ruiz, informed Life Fitness that Ruiz kept Life Fitness parts in multiple storage units in Washington. Life Fitness hired Paul Moore from Phoenix Loss Prevention to investigate. Moore met with Mary[1] in Olympia, where she gave him access to two storage units located on 93rd Avenue that contained large quantities of Life Fitness parts and equipment. Ruiz had leased the units, D-9 and A-14, in Mary's name to avoid detection by Life Fitness.

---

[1] Because Ruiz and his former wife share the same last name, we refer to Mary Ruiz by her first name for purposes of clarity. We mean no disrespect.

When Ruiz met with Moore, he told Moore that he had been selling Life Fitness parts and equipment to six or seven customers and that he kept the parts and equipment at a storage facility. He said that he got some of the equipment from Mass Movement, a company that Life Fitness used to dispose of its old equipment. Instead of disposing of the equipment or destroying it as required by Life Fitness, Mass Movement gave it to Ruiz, who would then resell it. Ruiz also told Moore that he had done repairs not authorized by Life Fitness for various fitness centers and that he had been doing so for approximately four to five years. During that time, he made approximately $50,000.

Ruiz then showed Moore a third storage unit in Black Lake that Ruiz rented in his neighbor's name. The storage unit contained additional Life Fitness parts and equipment. Moore removed the parts and equipment from the storage unit and Life Fitness rented its own storage unit, K-12, to store them. Life Fitness terminated Ruiz's employment in December 2007.

In January 2008, Moore and Life Fitness employees Monty Martinez, Tony Scianna, and Paul Hawrysz inventoried Ruiz's service van and storage units A-14 and D-9. Hawrysz identified each item and Martinez prepared a handwritten inventory of the items. The information from the inventory was organized into three different Excel spreadsheets—one for the service van, one for unit A-14, and one for unit D-9. Scianna sent these spreadsheets to Anthony Bravata, a Life Fitness quality analyst who compared the parts on the spreadsheet with the parts Ruiz was shown to have according to Life Fitness's records to calculate the "shrink" and "excess." RP at 237-38. "[S]hrink" was the inventory that Ruiz was supposed to have but did not, and "excess" was the inventory Ruiz possessed that he was not supposed to have. RP at 237-38. When Bravata made his calculations, he reviewed only the Excel spreadsheets, not the original handwritten inventories.

Life Fitness also discovered that a company called Attitude Equals Results (AER) allowed Ruiz to store Life Fitness parts at AER's Oregon facility, so Life Fitness seized those parts and stored them in the K-12 storage unit with the inventory found in the Black Lake storage unit. In February, Martinez inventoried the items in K-12, put the information into an Excel spreadsheet, and sent the spreadsheet to Life Fitness in Chicago. Bravata did not receive this spreadsheet and, thus, the data it contained was not factored into his earlier calculations of shrink and excess.

The State charged Ruiz with crimes allegedly committed between January 1, 2002, and December 31, 2007.[2] In December 2008, the State charged Ruiz with one count of first degree theft[3] and one count of first degree possession of stolen property.[4] In May 2010, the State filed a second amended information charging Ruiz with an additional count of first degree trafficking in

---

[2] The time period during which Ruiz allegedly committed the crimes spanned six years and the acts constituting the crimes were so numerous that the State did not charge each individual act as a separate crime. The statutes under which the State charged Ruiz were amended multiple times during the six-year period. None of the changes are relevant to our analysis; accordingly, we cite the version of the statute in effect at the latest date alleged in the information, December 31, 2007.

[3] Former RCW 9A.56.030(1)(a) (2007) provided, "A person is guilty of theft in the first degree if he or she commits theft of . . . [p]roperty or services which exceed(s) one thousand five hundred dollars in value." This amount was raised to $5,000 in 2009. LAWS OF 2009, ch. 431, § 7 (effective July 26, 2009). "'Theft' means: . . . To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(a).

[4] Former RCW 9A.56.150(1) (2007) provided, "A person is guilty of possessing stolen property in the first degree if he or she possesses stolen property . . . which exceeds one thousand five hundred dollars in value." This amount was raised to $5,000 in 2009. LAWS OF 2009, ch. 431 § 12 (effective July 26, 2009). "'Possessing stolen property' means knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto." RCW 9A.56.140(1).

stolen property.[5] The State also alleged that the first degree trafficking in stolen property crime was a major economic offense because it involved "attempted or actual monetary loss substantially greater than typical for the offense" and, thus, was an aggravating factor justifying a sentence above the standard range. Clerk's Papers (CP) at 5 (citing former RCW 9.94A.535(3)(d)(ii) (2007)).

The State did not receive the Excel spreadsheet with the K-12 inventory until one week before trial. Upon receipt of the spreadsheet, the State immediately submitted it to Ruiz. Bravata originally testified that the market value of the excess inventory, excluding defective parts, was $73,960.40 and the shrink was $21,743.97. But Bravata testified that the actual value of the parts was likely higher because the defective parts had value to Life Fitness. Thus, when he calculated the values of shrink and excess including the defective parts, the value of the excess was $92,495.30 and the market value of the shrink was $36,725.14. Then, during the midday break on the first day of trial, the State gave Bravata the K-12 inventory data and he created a new spreadsheet, recalculating shrink and excess. His new calculations revealed a $12,455.16 reduction of shrink from his original calculations.[6] When Bravata made the recalculations, he had both the Excel spreadsheets and the handwritten inventories but did not compare the two.

---

[5] A person is guilty of first degree trafficking in stolen property if that person "knowingly initiates, organizes, plans, finances, directs, manages, or supervises the theft of property for sale to others, or who knowingly traffics in stolen property." RCW 9A.82.050(1). "'Traffic' means to sell, transfer, distribute, dispense, or otherwise dispose of stolen property to another person, or to buy, receive, possess, or obtain control of stolen property, with intent to sell, transfer, distribute, dispense, or otherwise dispose of the property to another person." RCW 9A.82.010(19).

[6] It is not clear from the record whether this figure includes defective parts. The record also does not indicate what, if any, change in excess Bravata's recalculations revealed.

Due to Ruiz's concern that Bravata did not have the original handwritten inventories when he made the initial calculations, Bravata calculated shrink and excess for a third time, this time comparing the Excel spreadsheets and handwritten inventories. He then testified that the market value of the shrink, excluding defective parts, was $20,849.89, a decrease of $894.08, and the market value of the excess was $59,574.26, a decrease of $14,386.15.[7] He testified that the discrepancies resulted from transcription errors when the handwritten inventory sheets were originally transcribed into the Excel spreadsheets.

Ruiz's counsel did not hire an independent accountant to verify the State's calculations of shrink and excess. When defense counsel discovered that Bravata had made additional calculations using the data from the K-12 inventory, he unsuccessfully moved to dismiss, alleging that the State had failed to disclose exculpatory evidence. The State responded that the latest calculations were not new evidence; rather, Bravata merely made additional calculations based on existing information that was given to counsel the week before trial.

Ruiz testified that many of the parts and much of the equipment in the storage units belonged to him—not Life Fitness, that he purchased equipment from the military, and that various fitness clubs gave him parts. Ruiz also disputed Martinez's, Scianna's, and Hawrysz's ability to properly determine which parts were defective during the inventory.

In addition to testimony regarding Ruiz's unauthorized repair and resale of Life Fitness equipment and parts, the State presented evidence that Ruiz made unauthorized use of his Life

---

[7] Including the defective parts, he testified that the market value of the excess was $87,412.12, a decrease of $5,083.18, and the market value of the shrink was $34,302.31, a decrease of $2,422.83.

No. 42349-9-II

Fitness credit card to purchase gasoline for himself and his friends. Defense counsel did not object to this testimony.

On cross-examination, defense counsel asked Moore about his refusal to submit to a tape-recorded interview. The State objected to the questioning because Washington law requires both parties to consent to a recording and "the defense should not be able to draw a sinister inference from [Moore] exercising a privilege that is granted to him under the law[ ]." RP at 563. The trial court overruled the objection but told the State that it would give a cautionary jury instruction stating that the limited purpose of the questioning was to determine Moore's credibility.

When defense counsel again asked Moore about his refusal to engage in a recorded interview, Moore interpreted the question as an assertion that defense counsel had previously spoken with Moore when actually defense counsel had only spoken with Moore's secretary. Moore responded, "I never refused not [sic] to meet you. I never talked to you. . . . And you just sit [sic] here before this judge and told him a . . . bald-faced lie about calling me." RP at 567-68. Immediately following the statement, the State requested a cautionary instruction and the trial court gave the following jury instruction:

> [T]he information that you've heard should be stricken from the record, and you should disregard it except that portion of the responses made directly to the question, "A," did you refuse to meet, and "B," did you decline or refuse to have the conversation tape-recorded. Those questions and answers are admitted for the limited purpose of determining the credibility of the witness.

RP at 569.

Defense counsel claimed that Moore's comments were unfairly prejudicial and moved for a mistrial, but the trial court denied the motion because it concluded that the cautionary instruction cured any unfair prejudice arising from the comments. The following day, defense

8

counsel requested that the trial court admit the transcript of proceedings outside the presence of the jury; wherein defense counsel clarified that he had spoken with Moore's secretary—not Moore himself. The trial court denied the motion but invited defense counsel to propose a curative instruction.

Defense counsel proposed the following instruction, "The jury is instructed that the court has no reason to believe that [defense counsel] lied to the court about his contact or lack of contact with . . . Moore regarding setting up an interview with . . . Moore." RP at 688 (internal quotation marks omitted). The trial court declined to give the instruction because the instruction included a statement about the trial court's conclusions regarding the truthfulness of Moore's statement. The trial court then informed defense counsel that it would be willing to give an instruction stating that defense counsel's veracity was not at issue at trial and that the jury should not consider it, but defense counsel did not request such an instruction.

The jury convicted Ruiz on all three counts and the trial court sentenced him to 12 months' confinement. Although the trial court concluded that first degree theft and first degree possession of stolen property were same criminal conduct, it failed to indicate that conclusion on the judgment and sentence.

Ruiz appeals.

ANALYSIS

Ruiz argues that his trial counsel was ineffective because he failed to (1) hire a forensic accountant to determine the value of stolen Life Fitness parts and equipment, (2) object to irrelevant testimony regarding Ruiz's use of his Life Fitness credit card to purchase gasoline, and (3) propose an adequate limiting instruction after Moore testified that defense counsel had lied. He also contends, and the State concedes, that the trial court made a scrivener's error when it

failed to indicate that first degree theft and first degree possession of stolen property were same criminal conduct on the judgment and sentence. Because Ruiz has failed to show how his trial counsel's allegedly deficient performance prejudiced him, we deny his claims that his counsel was ineffective and affirm his convictions. But we remand to the trial court to correct the judgment and sentence to show that his convictions for first degree theft and first degree possession of stolen property constituted same criminal conduct.

I.      INEFFECTIVE ASSISTANCE OF COUNSEL

        A. Standard of Review

        We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance of counsel claim, the defendant must show that defense counsel's objectively deficient performance prejudiced him. *State v. McFarland*, 127 Wn.2d 322, 334–35, 899 P.2d 1251 (1995). Performance is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *McFarland*, 127 Wn.2d at 334–35. Prejudice results if the outcome of the trial would have been different had defense counsel not rendered deficient performance. *McFarland*, 127 Wn.2d at 337.

        We give great deference to trial counsel's performance and begin our analysis with a strong presumption that counsel was effective. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *McFarland*, 127 Wn.2d at 335. A claim that trial counsel provided ineffective assistance does not survive if trial counsel's conduct can be characterized as legitimate trial strategy or tactics. *State v. Hendrickson*, 129 Wn.2d 61, 77–78, 917 P.2d 563 (1996), *overruled on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). To rebut the strong presumption that counsel's performance was effective,

"the defendant bears the burden of establishing the absence of any '*conceivable* legitimate tactic explaining counsel's performance.'" *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (emphasis in original) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Where a defendant claims that his or her counsel was ineffective for failing to make a particular motion, "[a]bsent an affirmative showing that the motion probably would have been granted, there is no showing of actual prejudice." *McFarland*, 127 Wn.2d at 337 n.4.

"[A] defense attorney has a 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 721, 101 P.3d 1 (2004) (quoting *Strickland*, 466 U.S. at 691). "Not conducting a reasonable investigation is especially egregious when a defense attorney fails to consider potentially exculpatory evidence." *Davis*, 152 Wn.2d at 721. But defense counsel's "action or inaction must be examined according to what was known and reasonable at the time the attorney made his choices." *Davis*, 152 Wn.2d at 722. "[A]nd, 'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'" *Davis*, 152 Wn.2d at 722 (internal quotation marks omitted) (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)).

B. Failure To Hire Forensic Accountant

Ruiz first argues that his trial counsel was ineffective for failing to hire a forensic accountant to review the State's calculations of the value of the Life Fitness parts and equipment found in the storage units and service van. The State argues that defense counsel's performance did not fall below an objective standard of reasonableness because "the evidence presented was a matter of simple arithmetic, not a complicated accounting that required an expert witness" and

11

that Ruiz has failed to show that he was prejudiced by any allegedly deficient performance. We agree with the State.

To determine the scope of the theft and the value of the stolen property, the State used Bravata's comparisons summarizing the differences between the value of Ruiz's inventory according to Life Fitness records and the inventories done by Martinez, Scianna, and Hawrysz. The only raw data originally unavailable to defense counsel was the inventory of the K-12 storage unit, which was given to defense counsel one week before trial. Thus, by the time of trial, defense counsel had had all of the information required to make the calculations, and comparisons of that data required only arithmetical calculation for which an accountant's services, while helpful, were not necessary. And the record does not reflect that defense counsel moved for a continuance after receiving the additional K-12 data. Accordingly, Ruiz has failed to show how his counsel's performance fell below an objective standard of reasonableness. *McFarland*, 127 Wn.2d at 334–35.

And even if a forensic accountant could have been helpful in achieving a more accurate calculation of the shrink and excess, Ruiz fails to show how he was prejudiced by his counsel's failure to hire an expert witness. A comparison of the figures presented at trial reveals that the greatest excess resulting from the calculations was $92,495.30 and the least was $56,574.26 and the greatest shrink was $36,725.14 and the least was $20,849.89. Although these discrepancies were not insignificant, they had no effect on the jury's determination of whether Ruiz committed the charged crimes because the monetary thresholds for first degree theft and first degree possession of stolen property were $1,500 at all times relevant here, and even the lowest figures presented at trial significantly exceeded these threshold values. Former RCW 9A.56.030(1)(a) (2007); former RCW 9A.56.150(1) (2007).

And it was only Bravata's analysis of the data, not the data itself, that changed during trial and the record does not indicate how any additional calculations could have further reduced the values generated by Bravata once he made his final calculations.[8] Although these discrepancies may have been material to a finding that the crimes constituted serious economic offenses, the jury found that the crimes were not serious economic offenses; thus relieving Ruiz from imposition of an exceptional sentence based on that aggravator.

Ruiz nevertheless argues that defense counsel's failure to hire a forensic accountant compelled him to testify because he was required "to be his own accountant at trial." Br. of Appellant at 17 (emphasis omitted). At trial, Ruiz disputed the ability of the individuals conducting the inventory to properly determine which parts were defective and he testified that many of the parts belonged to him, not Life Fitness. But this evidence went to the weight of the State's evidence that the property actually belonged to Life Fitness or was defective. It was not evidence that could have been obtained through the services of a forensic accountant.

Thus, Ruiz has failed to show that but for his trial counsel's failure to hire a forensic accountant, the outcome of the trial would have been different. Accordingly, we hold that Ruiz has failed to show that he was prejudiced, and his ineffective assistance of counsel claim fails. *McFarland*, 127 Wn.2d at 337.

C. Failure To Object to Testimony Regarding Use of Company Credit Card

Next, Ruiz contends that defense counsel was ineffective because he failed to object to irrelevant testimony regarding Ruiz's use of his Life Fitness credit card to purchase gasoline for himself and for others. He argues that because the State failed to establish the value of the

---

[8] We note that if Ruiz discovers evidence that refutes these figures, reducing the totals below the threshold amounts of the crimes charged, he may have the opportunity to seek relief through a personal restraint petition, RAP 16.4.

gasoline, the testimony was irrelevant to prove the crimes charged and, thus, defense counsel was ineffective for failing to object to it. The State responds that although the evidence was not relevant to prove the crimes for which a monetary value was necessary—first degree theft and first degree possession of stolen property—it was relevant to prove first degree trafficking in stolen property. We agree with the State.

The monetary value of the property allegedly trafficked is not an element of first degree trafficking in stolen property—the State was merely required to show that Ruiz transferred stolen property to another person. RCW 9A.82.050(1); RCW 9A.82.010(19). Thus, although the theory was not well developed at trial, it appears that the evidence that Ruiz used the company credit card to purchase gasoline for third parties was relevant to the charge of first degree trafficking in stolen property. Because the evidence was relevant, the trial court likely would have denied a motion to exclude it and, thus, Ruiz's claim fails.[9] *McFarland*, 127 Wn.2d at 337, n.4.

Moreover, even if the evidence should have been excluded, Ruiz has failed to show that he was prejudiced by it. Although evidence regarding Ruiz's use of the Life Fitness credit card to make unauthorized gasoline purchases was introduced numerous times during trial, it was relatively insignificant in light of the overwhelming evidence of Ruiz's theft, possession, and resale of Life Fitness equipment and parts. Accordingly, we hold that Ruiz has failed to show that the outcome of the trial would have been different had the jury not heard the testimony and,

---

[9] Ruiz contends that the trial court likely would have sustained an objection to the testimony because the trial court explicitly stated that the information regarding Ruiz's use of the Life Fitness credit card was "irrelevant." Br. of Appellant at 18-19 But, when read in context, the trial court was referring to the evidence specifically in the context of first degree theft, not first degree trafficking in stolen property.

14

thus, his claim fails because he has failed to show that he was prejudiced. *McFarland*, 127 Wn.2d at 337.

D. Failure To Propose Limiting Instruction

Ruiz next asserts that defense counsel was ineffective because he failed to propose a limiting instruction after Moore stated on cross-examination that defense counsel had lied. The State responds that Ruiz has failed to show how his trial counsel's failure to propose an adequate limiting instruction was anything but a legitimate trial strategy or tactic. We agree with the State.

As a preliminary matter, Ruiz's contention that defense counsel failed to propose a limiting instruction is factually inaccurate. Defense counsel did on one occasion propose a limiting instruction, but the trial court declined to give the instruction because doing so would have improperly required the trial court to comment on the credibility of a witness. The trial court made clear that an instruction discussing Moore's credibility was unacceptable but that an instruction stating that defense counsel's credibility was not at issue at trial was acceptable.

Although he was aware of an instruction that would have been acceptable to the trial court, defense counsel may have chosen not to propose one because the instruction could have been more prejudicial than curative by drawing attention to Moore's comment. Moreover, the trial court gave a cautionary instruction immediately following Moore's comment that instructed the jury that it was to consider his statements only for the purpose of determining his credibility. Thus, instead of requesting another instruction, defense counsel may have chosen to rely on the instruction already given instead of bringing the matter to the jury's attention for a second time. Because "the defendant bears the burden of establishing the absence of any '*conceivable* legitimate tactic explaining counsel's performance,'" and because Ruiz fails to persuade us that

15

there was no conceivable legitimate tactic explaining his counsel's failure to propose an admissible curative instruction, we hold that this claim fails. *Grier*, 171 Wn.2d at 42 (emphasis in original) (quoting *Reichenbach*, 153 Wn.2d at 130).

Even if defense counsel's performance was deficient, the State argues that Ruiz has failed to show how the absence of a curative instruction prejudiced him. In a trial spanning multiple days, the jury heard extensive testimony regarding Ruiz's possession of Life Fitness property that did not belong to him and testimony that Ruiz transferred that property to others on multiple occasions, and Ruiz has failed to allege that he was prejudiced by Moore's comment in light of the overwhelming evidence against him. Because Ruiz has failed to show how the outcome of the trial would have been different but for the absence of a limiting instruction, his ineffective assistance of counsel claim fails.[10] *McFarland*, 127 Wn.2d at 337.

II.     SCRIVENER'S ERROR

Finally, Ruiz argues, and the State concedes, that the trial court made a scrivener's error when it failed to indicate on the judgment and sentence that his first degree theft and first degree possession of stolen property convictions constituted same criminal conduct. The trial court concluded during sentencing that first degree theft and first degree possession of stolen property constituted same criminal conduct and, consistent with that ruling, calculated an offender score

---

[10] Ruiz also argues that his convictions should be reversed because the cumulative effect of defense counsel's errors deprived him of his right to a fair trial. But because Ruiz has failed to show how his trial counsel's objectively deficient performance prejudiced him, we hold that Ruiz's cumulative error claim fails. *State v. Stevens*, 58 Wn. App. 478, 498, 794 P.2d 38 (1990).

of one instead of two for each conviction. *See* former RCW 9.94A.525 (2007).[11] But section 2.1 of the judgment and sentence states, "None of the current offenses constitute the same criminal conduct except" and the trial court failed to fill in the blank following that text when it should have listed first degree theft and first degree possession of stolen property. CP at 31.

We affirm Ruiz's convictions but remand to the trial court to correct this scrivener's error in section 2.1 of the judgment and sentence, but because the trial court properly calculated Ruiz's offender score, we affirm his sentence. CrR 7.8(a); RAP 7.2(e); *In re Pers. Restraint of Mayer*, 128 Wn. App. 694, 701-02, 117 P.3d 353 (2005).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Van Deren, J.

VAN DEREN, J.

We concur:

PENOYAR, J.

WORSWICK, C.J.

---

[11] The Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW, was amended multiple times during the time period during which Ruiz committed the crimes here, but the portions relevant to calculating Ruiz's offender score have not changed in any way relevant to this case. Neither party raises an issue regarding the trial court's calculation of Ruiz's offender score or the version of the SRA in effect at the time he committed the offenses. Accordingly, we cite the version of the statute in effect at the latest date alleged in the information, December 31, 2007.